IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ARTHUR RODGERS,            *
       Plaintiff

                              *     CIVIL ACTION NO. CCB-12-3778

V.

                              *

MICHAEL STALLINGS, et al.,[1]
       Defendants               *

                           ******

MEMORANDUM

Pending is a Motion to Dismiss or, in the alternative, Motion for Summary Judgment filed on behalf of defendants Sgt. Leah Youngblood, Sgt. Adam Whitacre, C.O. II Michael Stallings, C.O. II John Portmess, C.O. II Nicholas Soltas,[2] Executive Director of the Inmate Grievance Office (IGO) Scott S. Oakley, and Deputy Director of the IGO Robin Woolford.  ECF 39. Plaintiff Arthur Rodgers has responded. ECF 46 & 65.[3]  Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the dispositive motion will be granted.[4]

---

[1] The Clerk shall amend the docket to reflect the proper names of defendants.

Defendant Lambert has not been served with the complaint.  For the reasons that follow, even if Lambert had properly been served, he would be entitled to dismissal. As such, Rodgers' complaint against Lambert shall be dismissed.

[2] Rodgers previously moved to dismiss Soltas from the case. ECF 18, p. 2. The motion, filed prior to Soltas' response to the complaint, shall be granted.

[3] Attached to Rodgers' response to the dispositive motion is a motion to amend the complaint seeking to add Thomas Dorcon, David Robey, and S. Simpson, additional officers who participated in quelling the July 11 disturbance. ECF 46.   The motion, filed after receipt of the dispositive motion, shall be denied.  As noted below, these officers, if properly served with the complaint would be entitled to summary judgment, as Rodgers has failed to state an Eighth Amendment claim for excessive force as to the July 11 incident.

Additionally, claims regarding mail tampering, housing, legal research, and the like contained in Rodgers' supplemental opposition (ECF 65) are not properly before the court and shall not be considered here.

[4] On August 22, 2014, defendants' dispositive motion was denied without prejudice subject to renewal upon defendants making arrangements for Rodgers to view the video provided to the court as Exhibit 2A (ECF 39-6)  in support of their dispositive motion. ECF 57.  Rodgers was provided 17 days thereafter to file any additional

Background

Arthur Rodgers, who is incarcerated at the North Branch Correctional Institution ("NBCI"), filed a self-represented complaint, alleging that on July 11, 2012, he was assaulted by NBCI prison guards. ECF 1, p. 3.  Rodgers states that the assault began when he questioned Sgt. Youngblood regarding an administrative complaint he submitted.  *Id.* Rodgers states that Stallings intervened during his conversation with Youngblood, telling him to "shut [his] fucking mouth." *Id.*, p. 4. After Stallings' initial interjection, Stallings approached Rodgers and told him to "cuff up nigger" and "whether intentional or not his spittle hit my face as he said the word 'nigger.'" *Id.* Rodgers states that he automatically pushed Stallings from him, after which Stallings and Youngblood sprayed a chemical agent at Rodgers' face. *Id.* Rodgers responded by wrapping his arms around Stallings in order to prevent Stallings from hitting him with his handcuffs. *Id.*

Other officers responded to the scene. *Id.* Rodgers states he fell to the floor and while lying on his stomach with his right hand handcuffed behind him and his left hand over his head, he was kicked, punched, and spit upon while being called "nigger."  *Id.* Rodgers claims that he was hit on the head with handcuffs, causing two cuts in his forehead. *Id.* Although he could not see due to the chemical agent and kicks and punches to his eyes, Rodgers heard Youngblood tell Stallings to "fuck him up." *Id.*, p. 5. He also heard Whitacre say, "okay that's enough the captain's coming." *Id.*

After being seen in the medical department, Rodgers was taken to Housing Unit ("H.U.") #1, where he was stripped of his clothing, given a "jumpsuit," and placed in a cell. *Id.*, p. 6. He states he was mocked by various prison guards and only fed sporadically for three days. *Id.*

---

opposition. *Id.*  Correctional Case Manager Randy Durst avers that Rodgers viewed the DVD twice on September 4, 2014.  ECF 61-1. Rodgers sought and was granted an extension of time to file a further opposition to the dispositive motion (ECF 62 & 63) which has been received.  ECF 65.

Rodgers states that Portmess repeatedly threw empty brown paper bags into the cell, so that it would appear he was being fed, but in fact he was not. *Id*. Rodgers also states while distributing meals, Portmess would tell him that he would receive "phlegm" or "semen" sandwiches. *Id*., p. 7. Additionally, Rodgers indicates he was not provided sheets, a mattress,[5] a pillow, or any means to wash his body or brush his teeth, nor was he provided his prescribed medications, including medication to treat hypertension, high cholesterol, and pain, as well as an antibiotic. *Id*., pp. 6-7.

On July 15, 2012, Rodgers was moved to a new cell, where he states a new round of threats and harassment was undertaken by Soltas, Ortt, and Lambert.[6] *Id*., p. 7.   Rodgers states that on two occasions Ortt and Soltas threatened him, referencing the fate of a prisoner who had died at the Western Correctional Institution during an altercation with guards.  *Id*.  Soltas advised Rodgers that he decided which Administrative Remedy Procedure Act grievances ("ARPs") to turn in and that two ARPs Rodgers submitted were not processed. *Id*. Rodgers claims that Ortt, Soltas, and Lambert threatened him with repercussions for filing ARPs, indicating that the altercation on July 11, 2012, was nothing compared to what they would do to him. *Id*.

On August 1, 2012, Rodgers was moved to a new cell with an inmate who had a long history of mental health problems and who had stopped taking his prescribed medication.  *Id*., pp. 7-8. Rodgers states he notified Lambert and other authorities, and Lambert told him to "do your best, and we'll just remember all you write when we're legally stomping your ass." *Id*., p. 8.

Rodgers alleges that his efforts to exhaust administrative remedies were thwarted.  *Id*., pp. 12-14. He indicates that Woolford improperly denied his grievance filed regarding the July 11 incident. *Id*., p. 14. In his amended complaint, Rodgers alleges Scott Oakley, Executive Director

---

[5] Rodgers states that Cpl. Fann fed him, gave him a mattress, and denied being part of the group harassing Rodgers. ECF 1, p. 7.

[6] Rodgers previously moved to withdraw his complaint as to Ortt and Soltas. ECF 18.

for the Inmate Grievance Office, and Robin Woolford violated his 14th Amendment rights. ECF 22, p. 1. Specifically, Rodgers takes issue with Woolford's reliance on his having been found guilty of inmate rule violations relating to the assault on July 11 as a basis for denying his grievance concerning the assault. *Id*., pp. 3-4.

In support of their dispositive motion, defendants indicate that Rodgers' allegations regarding use of force on July 11 were investigated by the Internal Investigative Unit ("IIU"). ECF 39-5.  IIU Detective Sgt. Robert Fagan, who was assigned to review the case, reviewed Rodgers' medical reports as well as staff reports and the video of the incident. *Id*., pp. 4-9. Additionally, Fagan interviewed Rodgers, medical staff, and several of the correctional officers. *Id*. When interviewed by Fagan, Rodgers admitted pushing Stallings.  *Id*., p. 8. Fagan's review of the video showed Rodgers as the aggressor shoving Stallings away and struggling with the officers as they attempted to control Rodgers. *Id*., p. 9. This behavior led to the decision to close the investigation. *Id*., pp. 7, 9.

Stallings avers that on July 11, 2012, he was assigned to security for the NBCI medical department which was conducting chart reviews with inmates housed in NBCI H.U. #3.  ECF 39-8, ¶ 4.  While reviewing his chart Rodgers began questioning Youngblood regarding the status of an ARP he submitted. *Id*., ¶ 5. Youngblood explained the ARP would be delivered once the mail was collected by the tier officers. *Id*. Rodgers continued asking Youngblood why she did not deliver the ARP to him personally. *Id*. At that point, Stallings attempted to redirect Rodgers back to his medical chart and attempted to reassure Rodgers by explaining that once the mail was picked up by the officers on the tier Rodger would receive the ARP.  *Id*., ¶ 6. While explaining the process to Rodgers, Rodgers said to Stallings, "I wasn't fucking talking to you." *Id*., ¶ 7. Stallings directed Rodgers to look at his chart or go back to his cell, and Rodgers again responded

that he wasn't talking to Stallings. *Id*. At that point Stallings determined it was best for Rodgers to return to his cell and instructed Rodgers to place his hands behind his back in order to be handcuffed. *Id*. When Stallings approached Rodgers, Rodgers stood up and struck Stallings in the chest with both his hands. *Id*. When struck, Stallings immediately administered pepper spray. *Id*., ¶ 8. The pepper spray did not stop Rodgers; he grabbed Stallings and the two struggled, both falling to the floor. *Id.* On the floor Rodgers continued to struggle and refused Stallings' orders to stop resisting and submit to handcuffing. *Id*., ¶ 9. Only when additional officers arrived to assist was Rodgers able to be handcuffed. *Id*. Stallings avers that no force was needed or used once Rodgers was handcuffed and he stopped resisting. *Id*., ¶ 10. Rodgers was then escorted to the housing units' medical room where he was examined by medical staff. *Id*., ¶ 11.

Stallings denies using any racist comments toward Rodgers. *Id*., ¶ 12. He also denies spitting on Rodgers. *Id., ¶ 13.* Stallings submitted a use of force report, wrote an infraction on Rodgers, and was interviewed by IIU. ECF 39-5, pp. 4-5, 21-22, 45. All of Stallings' statements and reports are consistent in their reporting of the events surrounding the altercation. *Id*.

Medical Records Clerk Christina Butler witnessed the altercation. *Id*., p. 35. In her witness statement and in her interview with IIU, she reported that while Rodgers was reviewing his medical chart he began cursing at Stallings who then instructed Rodgers to cuff up. *Id*., pp. 4, 35-36. Rodgers asked Stallings what he was going to do about it and then hit Stallings. *Id*., pp. 4, 36. As Stallings tried to cuff Rodgers they both went to the floor.[7] *Id*., p. 4. Youngblood also confirmed this version of events in her interview with Fagan, and specifically denied that

---

[7] Medical Clerk Angela Swisher confirmed that during chart review Rodgers began questioning Youngblood regarding his ARP, when Stallings intervened. ECF 39-5, pp. 6, 38. Rodgers stated "I wasn't fucking talking to you. I was talking to her." *Id*., pp. 6, 38-39. Stallings walked over to Rodgers and when he was next to Rodgers, Rodgers stood up and asked "What are you going to do about it?" *Id*., pp. 6, 38. Stallings directed Rodgers to cuff up and Rodgers swung at the officer. ECF 39-5, pp. 6, 39.

Stallings used racial epithets when referring to Rodgers or otherwise provoked Rodgers. *Id.*, pp. 4-5, 8.

Whitacre avers that on July 11, 2012, he responded to a 10-13 (officer in need of assistance) in H.U. #3. ECF 39-9, ¶ 2. He saw other correctional officers involved in a physical altercation with Rodgers who was on the ground with both of his hands tucked and hidden under his body. *Id.* He observed blood on the floor and that pepper spray had been dispensed. *Id.* Whitacre avers that the situation was extremely dangerous because officers were experiencing the effects of the pepper spray and the spray had made the floor extremely slippery as officers tried to gain compliance from Rodgers who was not restrained and who was refusing orders to be handcuffed. *Id.* Rodgers continued to struggle and kept his hands underneath his body as officers attempted to pry his hands from under him. *Id.* Whitacre avers that at that time he was unaware whether Rodgers possessed a weapon. *Id.* Rodgers continued to refuse orders to comply, and continued resisting and struggling, resulting in an officer taking a bad fall on the slippery floor. *Id.* ¶ 3.

Whitacre avers that when an inmate remains non-compliant, the use of a higher level of force is permitted. *Id.* He states that at this point in the altercation, using his professional judgment, he decided to attempt to dislodge one of Rodgers' hands by kicking Rodgers' left shoulder, forcing his left arm back and permitting officers to secure the handcuffs. *Id.* Whitacre then placed his right foot on Rodgers' shoulder so that officers could safely exit the area. *Id.*

Whitacre and Officer Simpson escorted Rodgers for decontamination of the pepper spray. *Id.*, ¶ 4. Whitacre and Sergeant Werner then escorted Rodgers to the Support Services Building to the Medical Department for further assessment or treatment. *Id.*

Whitacre denies stating "Okay, that's enough the Captain's coming," as Rodgers alleges. *Id.*, ¶ 5. Whitacre further states that given the location of the incident, a confined area, it is impossible to see for a long distance. *Id.* In addition to his affidavit, Whitacre was interviewed by IIU and also submitted a report regarding the use of force. ECF 39-5, pp. 5, 20. Both comport with his affidavit submitted in this case. *Id.*

Results of the IIU investigation showed that Officers Thomas Dorcon, David Robey, and S. Simpson responded to the incident. *Id.*, p. 5. Simpson indicated he responded to the call for assistance and assisted in securing Rodgers and escorting him to medical. ECF 39-5, pp. 5, 24. Robey stated that when he arrived at the scene, pepper spray had been applied and Rodgers was continuing his assault on Stallings. *Id.*, pp. 5, 28. He reported applying several closed fist blows to gain control of Rodgers and stop the assault. *Id.* He also reported assisting in forcing Rodgers to the ground. *Id.* Dorcon also indicated he responded to the incident, where he observed officers and Rodgers involved in an altercation. *Id.*, pp. 5-6, 31. He reported throwing approximately six right hand punches to Rodgers' body in an effort to gain his compliance and stop the assault. *Id*, pp. 6, 31. Once additional staff arrived he assisted in securing Rodgers' left arm so that handcuffs could be applied. *Id.*

Rodgers was seen in the medical unit on July 11, 2012, where he received four sutures on the right side of his forehead. ECF 39-5, pp. 51, 71-72. The laceration on the left side of his forehead was closed with Dermabond medical glue. ECF 39-5, pp. 51, 71-72; ECF 39-10, p. 53. His face was swollen. ECF 39-5, p. 71. X-rays were negative for any facial fractures. ECF 39-10, p. 50. Other than lacerations on his face with a small amount of bleeding, facial swelling, and tenderness, no other injuries were noted. ECF 39-5, 71-72; ECF 39-10, p. 53-54. The sutures were removed on July 25, 2012. ECF 39-10, pp. 60-61. At that time Rodgers did not report any pain at

the laceration site. *Id.*, p. 60.  Rodgers complained of eye problems following the use of force. ECF 39-10, p. 44. Medical staff noted he was in need of an eye examination and eyeglasses and was referred to Optometry, where he received new eyeglasses *Id.*, pp. 21, 43-44, 46-47, 62-63. He continued submitting sick call slips complaining of headaches and vertigo, sometimes accompanied by nausea, indicating that his symptoms were caused by the altercation on July 11. *Id.*, pp. 23, 28, 40, 42, 44, 65, 67-68.

As a result of the July 11, 2012 incident, Rodgers was served with a notice of inmate rule violation charging him with violating rule #101 (assault or battery on staff), and violating rule #400 (disobeying an order).  ECF 39-14, p. 7. Rodgers' hearing was held on July 24, 2012. *Id.*, pp. 10-13. He was found guilty of both violations and received one year of disciplinary segregation and a mandatory loss of visitation for one year. *Id.*, pp. 12-13; ECF 39-15.

Contrary to Rodgers' assertions, Fann has no recollection of making any statement to Rodgers concerning his allegations that he was mistreated by staff, nor does he recall providing Rodgers a mattress. ECF 39-11, ¶¶ 4-5. Fann never witnessed staff withhold food from Rodgers or any other inmate. *Id.*, ¶ 5. Soltas avers that he has never failed to submit an ARP received from Rodgers or any other inmate and that he has never harassed, abused, threatened, or retaliated against Rodgers. ECF 39-12, ¶¶ 4-5. Portmess avers that he has never withheld meals from Rodgers, nor has he ever told Rodgers his food was laced with phlegm or semen. ECF 39-13, ¶¶ 4-5.

From March 21, 2007 through July 30, 2013, Rodgers filed 64 ARPs while confined at NBCI. ECF 39-16.  Relevant to this case, on July 10, 2012, the day before the July 11 altercation, Rodgers submitted ARP NBCI #1813-12 complaining that his new cellmate had mental health

issues. ECF 39-17. The ARP was dismissed as moot on July 11, 2012, as Rodgers had moved to the segregation unit following the July 11 altercation with staff. *Id.*, p. 1.

ARP NBCI #1941-12, submitted by Rodgers on July 20, 2012, complained about the altercation with staff on July 11, 2012. ECF 39-18. The ARP was dismissed as without merit at both the institutional and DOC headquarters level. *Id.*, pp. 1, 8.  Rodgers filed a grievance with the IGO on September 28, 2012, IGO No. 20122032, as an appeal from the disposition of this ARP. ECF 39-20, ¶ 3. The IGO grievance was administratively dismissed on December 28, 2012, due to Rodgers' failure to respond to a letter directing he show cause why the complaint should not  be dismissed due to his having been found guilty at his disciplinary hearing.  *Id.*

Rodgers submitted ARP NBCI #2380-12 on August 22, 2012, complaining about his cellmate. ECF 39-19. The ARP was dismissed on August 24, 2012, as repetitive. *Id.*

Standard of Review

A.      Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).   The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove "no set of facts" in support of his claim which would entitle him to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62 (2007).   Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id.* at 563.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to

actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the complaint in light of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir.  2005); *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.*  Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563.  Thus, a complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id*. 570.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility

of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

B.      Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 523 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.   Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. *Id*. at 256. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. *See id*. at 324.

Analysis

A.     Respondeat Superior

Rodgers alleges that Oakley is liable for the actions of Woolford, his subordinate, who dismissed Rodgers' IGO complaint. Rodgers' complaint against Oakley is based solely upon the doctrine of *respondeat superior*, which does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).   Liability of supervisory officials must be "premised on 'a recognition that supervisory

indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (*citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Rodgers has pointed to no action or inaction on the part of Oakley that resulted in a constitutional injury, and accordingly, his claims against him shall be dismissed.

B.    Excessive Force Claim

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in

a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 37-38.

In the context of the use of pepper spray by prison staff, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 440 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (emphasis omitted)).  "The use of tear gas against inmates in their cells is not per se a cruel and unusual punishment." *McCargo v. Mister*, 462 F.Supp. 813, 818 (D. Md. 1978).  It may be used in order to control recalcitrant inmates.  *Williams*, 77 F. 3d at 763.  Analysis regarding the amount of chemical agent used focuses, as with all other excessive force claims, on whether the defendant acted with a sufficiently culpable state of mind and whether the injury was sufficiently serious.  *Iko*, 535 F.3d at 238 (citations omitted) (holding correctional officer not entitled to qualified immunity where additional chemical agent was deployed into inmate's cell after inmate attempted to comply with officer's order, did not react violently, and officer failed to remove inmate's clothes or secure medical care for inmate after chemical agent exposure).

Eighth Amendment violations have been found where an officer used more than a reasonable amount of a chemical agent.  *See, e.g.*, *Furnace v. Sullivan,* 705 F.3d 1021, 1028-30 (9th Cir. 2013) (reversing summary judgment on an excessive force claim involving pepper spray where officer discharged can of pepper spray until empty, and other officer also joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732-33 (8th Cir. 2002) (finding an Eighth Amendment violation where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978-79 (10th Cir. 2001) (determining that the district court erred in holding that the plaintiff failed to state a constitutional claim where the officer

indiscriminately sprayed the entire prison tier). However, where an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams,* 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command to stop throwing water out of his cell's food service window); *Jackson v. Morgan*, 19 F. App'x. 97, 102-03 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell and did not show more than a de minimis injury); *Norris v. Detrick,* 918 F.Supp. 977, 983-84 (N.D.W.Va.1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown and charged the officers). Use of chemical agents is reasonable when, as here, an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls,* 599 F.3d 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson,* 315 F.3d 548, 557-58 (6th Cir. 2002) (holding use of pepper spray during prison riot was not malicious or sadistic, as required to support a claim of excessive force in violation of the Eighth Amendment).[8]

Correctional and medical staff indicate that Rodgers was the aggressor in the exchange. They indicate he was argumentative with Youngblood regarding the processing of his ARP and when Stallings redirected Rodgers he continued being argumentative. Stallings directed Rodgers to submit to handcuffing so he could return to his cell. The court has reviewed the video of the incident. *See* ECF 39-6. Although the video provided does not contain audio, it is clear that

---

[8] As the Fourth Circuit explained in *Williams*, "[a] limited application of mace may be 'much more humane and effective than a flesh to flesh confrontation with an inmate.' Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain." *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1262 (1984)). Here the application of the pepper spray was brief and Rodgers was provided a change of clothes and decontaminated. Prompt washing and medical attention have been considered a sufficient step to mitigate the use of chemical agents. *See Williams, supra*, 77 F.3d at 763-765.

Rodgers was speaking to Youngblood across the room while he reviewed his medical chart when Stallings interjected. Stallings came around the table and made gestures which appear to indicate Rodgers was ordered back to his cell. A review of the video shows Stallings and Rodgers engaged in a heated exchange of words as Stallings approaches Rodgers. Rodgers stands abruptly and aggressively, causing Youngblood to cross the room with her hand on her pepper spray.  Rodgers and Stallings continue their argument when Rodgers suddenly and violently hits Stallings' chest.

Rodgers admits striking Stallings, claiming he did so because Stallings used a racial epithet and spit hit him.  It is immaterial why Rodgers struck Stallings. The undisputed fact, confirmed by the video evidence, is that Rodgers assaulted a correctional officer. In response to Rodgers' assault, Stallings immediately sprayed pepper spray into Rodgers' face.  Rather than becoming compliant, Rodgers lunged at Stallings and wrapped him around the waist.  The two struggled and fell to the floor.  Medical staff exited the room and called for assistance. Other officers arrived. Some officers can be seen on the video hitting and delivering one kick to Rodgers who continued to struggle with Stallings. Once Rodgers' assault on Stallings ended, he continued to refuse to submit to handcuffing.

After the assault was quelled and Rodgers placed in restraints, he was stripped, provided a jumpsuit, decontaminated, and promptly treated by medical staff.  The matter was investigated by IIU whose investigation concluded that Rodgers was the aggressor and the use of force was appropriate.

It is clear that some force was necessary in order to stop Rodgers' assault upon Stallings and to gain his compliance in being handcuffed. Rodgers engaged in a heated exchange with Stallings, culminating in his striking Stallings in the chest. Stallings and Youngblood deployed pepper spray which was unsuccessful in stopping Rodgers' assault on Stallings. Rodgers

responded by grabbing Stallings about the waist, struggling with him. Rodgers refused repeated orders to stop the assault and to be handcuffed. Rodgers admits to striking Stallings and grabbing him about the waist but maintains he was justified in doing so as Stallings had used a racial slur and he feared Stallings would hit him. Additionally, Rodgers avers that once on the floor the responding officers unnecessarily kicked and punched him while spitting on him and calling him racist names.

Taking the facts in the light most favorable to Rodgers, his lawsuit nevertheless fails as his disputes of fact are not material to the determination of his claims. He admits that he struck Stallings in the chest and grabbed him around the waist, refusing direct orders to submit to being handcuffed. Faced with Rodgers' attack upon him, Stallings and Youngblood deployed pepper spray in order to gain Rodgers' compliance with a direct order, and in order to stop the assault on Stallings. The court has reviewed the video, which shows not only Rodgers suddenly push Stallings in the chest but thereafter grab him about the waist, lifting his feet from the floor in what appears to be Rodgers' attempt to take Stallings to the ground. The two struggle and Rodgers ends up behind Stallings, clenching him around the waist as to the two continue to struggle. Youngblood attempted to stop Rodgers' assault on Stallings by deploying pepper spray and other officers rushed into the room, using the amount of force necessary to stop the assault upon fellow officer Stallings and secure Rodgers. Contrary to Rodgers' assertion, the evidence does not show any officer using handcuffs to strike Rodgers.

As the other officers, including Whitacre, Dorcon, and Robey, responded to the scene they observed Rodgers and Stallings on the floor tussling. Rodgers' hands were not visible and it was unclear whether he possessed a weapon. The melee occurred in a small room with limited access, which was made all the more dangerous by the pepper spray on the floor, causing responding staff

17

to slip and fall (as can be seen in the video).  Rodgers' injuries were consonant with the use of pepper spray and the force described by officers-a kick to the shoulder and several closed fist punches, which the officers admit to and which were observed on the video.  Only the amount of force necessary to protect staff and restore order was used.  Once the officers were able to apply handcuffs, the use of force stopped. That Rodgers subjectively believes a lesser amount of force could have been used or that he was entitled to push Stallings for using a racial slur, is of no legal significance.  Whitacre, Dorcon, and Robey admit to kicking and hitting Rodgers but indicate doing so due to the exigency of the situation, their concern for officer safety, and in an attempt to restore order, belying Rodgers' contention that any of the responding officers acted sadistically in an effort to cause harm.

Although the court cannot resolve conflicting affidavits on summary judgment, Rodgers' contentions are at odds with the DVD. *See Witt v. West Virginia State Police, Troop 2,* 633 F.3d 272, 276 (4th Cir.2011) (stating that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] ... so that no reasonable jury would believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment .'") (quoting *Scott v. Harris,* 550 U.S. 372, 378 (2007)).

There is simply no evidence that during the brief altercation any of the responding officers were objectively aware that Rodgers had complied with the numerous orders to disengage and consent to being handcuffed or that they subjectively perceived that the amount of force being used to restore order was improper.  The use of force, including pepper spray, was not excessive in relation to the need to restore order and protect staff.  The record "falls far short" of showing there was "no plausible basis for [defendants'] belief that this degree of force was necessary." *Whitley,* 475 U.S. at 323.

To the extent Rodgers complains that any of the responding officers failed to follow established DPSCS policies and procedures regarding the amount of force used, his claim fails. To the extent that written directives regarding the use of force were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[9]

C.      Conditions of confinement

Rodgers alleges he was held in H.U. #1 for several days without hygiene items or prescribed medication, and that he was fed irregularly for three days. Officers Fann and Portmess specifically deny Rodgers' allegations. ECF 39-11 and ECF 39-13. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); see also *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) (observing the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.

---

[9]Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not constitute a violation of due process, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d at 238 (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U. S. at 302-03.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).   A government official's conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law.  *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury.   "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).  "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). To demonstrate "an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *Odom v. S. Carolina Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003). While Rodgers has alleged

generally that he was harmed, he has failed to allege, much less demonstrate, any specific injury arising from the conditions complained of.

D.      Verbal threats

Rodgers claims that officers used racial epithets during the use of force on July 11, 2012, other officers used racial slurs regularly, and officers otherwise threatened him with harm. "[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. *Collins v. Gundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (racial derogatory language, unless pervasive or severe enough to amount to racial harassment, does not amount to a constitutional violation); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Accordingly, Rodgers' allegations that defendants used racist language toward him fail to state a claim.

E.      Harassment and Retaliation

Rodgers claims that after the July 11 altercation, he was mocked by defendants, fed sporadically for three days, his prescribed medication was delayed, he was forced to house with inmates who are mentally ill, and his complaints were not properly handled. He alleges that these actions were in retaliation for his having filed complaints against officers.

In order to prevail on a claim of retaliation, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F. 3d 72, 75 (4th Cir. 1994). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone."

*Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 943 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim). Rodgers offers nothing in support of his claim other than self-serving conclusory averments. There is nothing in the record to suggest that defendants acted in the manner alleged.

Additionally, the evidence before the court refutes Rodgers' allegation of retaliation. The video evidence contradicts Rodgers' claim that he was subjected to excessive force. Rodgers received a full and fair hearing as to the disciplinary charge lodged against him. Additionally, defendants aver that they did not act in the manner alleged: e.g. they did not harass or retaliate against Rodgers, did not use racial slurs against him, and did not interfere with the proper processing of his ARPs. "In the prison context, we treat [claims of retaliation] with skepticism because every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).

To establish a civil conspiracy under § 1983, Rodgers must present evidence that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy," which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). Rodgers must allege facts establishing that defendants shared a "unity of purpose or a common design" to injure him.

*Am. Tobacco Co. v. United St*ates, 328 U.S. 781, 809-10 (1946).  Rodgers' claims that defendants conspired to retaliate against him is unsupported by the record.  A conclusory claim such as the allegation advanced by Rodgers is insufficient to state a claim. *See Boddie v. Schneider*, 105 F. 3d 857, 862 (2d Cir. 1997) (unsupported claim of conspiracy to issue false disciplinary reports fails to state a claim); *Langworthy v. Dean*, 37 F.Supp. 2d 417, 424-25 (D. Md. 1999) (conclusory allegations of conspiracy not to prosecute brought by alleged assault victim insufficient to state a claim).

F.     Disciplinary Proceedings

Rodgers' claims that Stallings wrote a false disciplinary report against him and that the hearing officer deprived him of due process during the disciplinary hearings fail. In prison disciplinary proceedings which bring the possible loss of good conduct credits, a prisoner is entitled to certain due process protections.  *See Wolff v. McDonnell*, 418 U.S. 539, 556-57 (1974). These include advance written notice of the charges against him, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision.  *Wolff*, 418 U. S. at 563-571.   Due process is satisfied if the disciplinary hearing decision was based upon "some evidence."  *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).  Rodgers received all the process he was due.  He was given timely advance written notice of the infractions and was permitted to attend the disciplinary hearing and have the inmate representative of his choice.  He also received written findings of the hearing officer.  No good conduct credits were revoked as a result of the disciplinary infractions. Moreover, the hearing officer's determination of guilt was based upon some evidence, including review of the video of the incident, testimony, and the written record, upon which the hearing officer based determinations as to credibility and demeanor.  *See* ECF 39-14, pp. 11-12.

G.     Access to Grievance Process

To the extent Rodgers alleges there were problems with the processing of his administrative remedy requests, his claim likewise fails.  While the long-standing rule has been that prisoners have no constitutional right to participate in an institutional grievance procedure, *see Adams*, 40 F. 3d at 75, the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, makes the issue less clear.  The PLRA requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner. 42 U.S.C. § 1997e(a). The Supreme Court has interpreted the language of this provision broadly, holding that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further clarification regarding exhaustion as a pleading requirement was announced by the United States Court of Appeals for the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), wherein the court held, "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Id*. at 681.  To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct, that evidence may be presented in response to the affirmative defense. *See id*. at 682. Thus, an inability to access the administrative remedy procedure based on an alleged refusal by prison officials to enforce the rules governing the process does not run afoul of the due process clause.  Assuming, *arguendo*, that defendants did not process or satisfactorily investigate or respond to Rodgers' remedy requests, Rodgers' claim fails as he has not demonstrated any resultant injury.

Rodgers' dispute with Woolford, who dismissed his IGO complaint, is also without merit. Rodgers disputes Woolford's reliance on *res administrata* as a basis for dismissing his grievance

regarding the July 11 incident. The record demonstrates, however, that the grievance was dismissed because Rodgers failed to respond to Woolford's letter directing him to show cause why the complaint should not be dismissed. ECF 39-20.  Rather than respond and present his argument to the IGO, Rodgers filed the instant complaint. There was nothing improper in the IGO's handling of Rodgers' grievance.

H.      Transfer

       As relief, Rodgers seeks transfer from NBCI. ECF 1, p. 3. It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship.  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."  *Meachum v. Fano*, 427 U.S. 215, 224 (1976); s*ee also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest).  Rodgers has not made the requisite showing of hardship and does not have a right to be housed in a particular prison.

Conclusion

       For the reasons stated, defendants' dispositive motion will be granted.[10] Rodgers' complaint against Soltas and Lambert will be dismissed. A separate order follows.


Date: <u>March 4, 2015</u>                              <u>          /S/                              </u>
                                                        Catherine C. Blake
                                                        United States District Judge

---

[10] Having found no constitutional violation, the court need not address defendants' immunity claims.